**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| MICASH INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:12-CV-248-JRG |
| | § | |
| NETSPEND CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |
| ———————————————— | § | |
| | § | |
| MICASH INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO. 2:12-CV-250-JRG |
| | § | |
| PRECASH, INC., | § | |
| | § | |
| *Defendant.* | § | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are Plaintiff's Opening Claim Construction Brief (Dkt. No. 55), the

consolidated response of Defendants PreCash Inc. ("PreCash") and NetSpend Corporation

("NetSpend") (collectively, "Defendants") (Dkt. No. 75), and Plaintiff's reply (Dkt. No. 77).[1]

The Court held a claim construction hearing on June 25, 2013.

---

[1] Defendants PreCash and NetSpend originally filed separate briefs (Dkt. Nos. 58 & 65), and
Plaintiff filed two separate reply briefs (Dkt. Nos. 66 & 67). All of those briefs were stricken by
the Court *sua sponte* as being in violation of the Court's page limits for claim construction
briefing. (Dkt. No. 68, 6/5/2013 Order.) The Court ordered the parties to re-file their response
and reply briefing within the applicable page limits. (*Id.*) Those consolidated briefs (Dkt. Nos.
75 & 77) are now before the Court.

**Table of Contents**

I. BACKGROUND ................................................................................................................. 3

II. LEGAL PRINCIPLES ...................................................................................................... 3

III. CONSTRUCTION OF AGREED TERMS ...................................................................... 7

IV. CONSTRUCTION OF DISPUTED TERMS ................................................................... 8

    A. "financial institution" (Claim 6) ..................................................................................... 8

    B. "loading cash value on the customer's card" (Claim 1) ................................................. 17

    C. "obtaining from the customer a) customer's name, customer's address, and customer's
       phone number and b) a recipient's name, recipient's address, recipient's phone
       number, and recipient's recognizable government identification number" (Claim 1) ....... 20

    D. "limiting the amount of money that may be loaded onto the customer's card and the
       number of cards issued to the customer by a central processing center of the non-
       financial institution to comply with government restrictions" (Claim 1) .......................... 24

    E. "monitoring and limiting loading of cash, transferring of money and accessing by
       recipient to comply with government money laundering restrictions" (Claim 7) .............. 31

    F. "verifying the personal information and the ability to transfer money of the customer
       and the recipient with the Office of Foreign Assets Control of the United States
       Treasury" (Claim 1) ....................................................................................................... 34

    G. "establishing a recipient account related to the customer's account after verification"
       (Claim 1) ........................................................................................................................ 40

    H. "authorizing transfer of requested amount of money from the customer's account to the
       recipient's account" (Claim 1) ....................................................................................... 43

    I. "card to account transfers" (Claim 3) .............................................................................. 46

V. CONCLUSION ................................................................................................................ 49

## I.  BACKGROUND

Plaintiff brings suit alleging infringement of United States Patent No. 7,258,274 ("the '274 Patent"), titled "Money Remittance Method."  The '274 Patent issued on August 21, 2007, from an application filed on October 6, 2005.  In general, the '274 Patent relates to pre-paid debit cards.  The Abstract of the '274 Patent states:

> A system wherein a customer is provided with a debit card, cash value is loaded onto the customer's card and a customer account is set up.  To allow money remittance, specific information is obtained of the customer and the recipient. These include their names, address, phone number and a recognizable government identification number.  The personal information of the customer and the recipient is verified with a government agency.  Once the personal information has been verified as acceptable, a recipient's account is established related to the customer's account.  The amount of money requested by customer is transferred from the customer's account to the recipient's account.  The recipient may be provided with a card providing access to the recipient's account.  The recipient may be in the same country or in a foreign country.

## II.  LEGAL PRINCIPLES

It is understood that "[a] claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention."  *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999).  Claim construction is clearly an issue of law for the court to decide.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, courts look to three primary sources: the claims, the specification, and the prosecution history.  *Markman*, 52 F.3d at 979.  The specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention.  *Id.*  A patent's claims must be read in view of the specification, of which they are a part.  *Id.*  For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims.  *Id.*  "One

purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir. 2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's invention. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). Although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This Court's claim construction analysis is substantially guided by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id.* The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention and that patents are addressed to, and intended to be read by, others skilled in the particular art. *Id.*

4

Despite the importance of claim terms, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id.* at 1315 (quoting *Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id.* at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

*Phillips*, 415 F.3d at 1316. Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. Like the specification, the prosecution history helps to demonstrate how the inventor and the Patent and Trademark Office ("PTO") understood the patent. *Id.* at 1317. Because the file history, however, "represents an ongoing negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id.*

5

Nevertheless, the prosecution history is intrinsic evidence that is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.  *Id.*; *see Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (noting that "a patentee's statements during prosecution, whether relied on by the examiner or not, are relevant to claim interpretation").

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony.  The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Phillips*, 415 F.3d at 1319-24.  According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter.  *Id.*

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings. Instead, the court assigned dictionaries a role subordinate to the intrinsic record.  In doing so, the court emphasized that claim construction issues are not resolved by any magic formula.  The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language.  *Id.* at 1323-25.  Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

Indefiniteness is a "legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted).  A finding of indefiniteness must overcome the statutory presumption of validity.  *See* 35 U.S.C. § 282.  That is, the "standard [for finding indefiniteness] is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008).

> In determining whether that standard is met, i.e., whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing, we have not held that a claim is indefinite merely because it poses a difficult issue of claim construction.  We engage in claim construction every day, and cases frequently present close questions of claim construction on which expert witnesses, trial courts, and even the judges of this court may disagree.  Under a broad concept of indefiniteness, all but the clearest claim construction issues could be regarded as giving rise to invalidating indefiniteness in the claims at issue.  But we have not adopted that approach to the law of indefiniteness.  We have not insisted that claims be plain on their face in order to avoid condemnation for indefiniteness; rather, what we have asked is that the claims be amenable to construction, however difficult that task may be.  If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite.  If the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on indefiniteness grounds. . . . By finding claims indefinite only if reasonable efforts at claim construction prove futile, we accord respect to the statutory presumption of patent validity . . . and we protect the inventive contribution of patentees, even when the drafting of their patents has been less than ideal.

*Exxon*, 265 F.3d at 1375 (citations and internal quotation marks omitted).

## III.  CONSTRUCTION OF AGREED TERMS

The parties have agreed that the proper construction of the term "non-financial institution" is an "entity that is not a financial institution."  (Dkt. No. 51, 3/28/2013 Joint Claim Construction and Prehearing Statement, at 2.)  The parties note that the meaning of this agreed-

upon construction will be affected by the Court's construction of "financial institution," which is addressed below.  (*Id.*)  The parties have also agreed that the preamble term "by a non-financial institution" is a limitation of Claim 1.  (*Id.*)

The Court hereby adopts these agreed-upon constructions.

## IV.  CONSTRUCTION OF DISPUTED TERMS

### A.  "financial institution" (Claim 6)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| "bank"[2] | "'financial institution' as defined by the Bank Secrecy Act" |

(Dkt. No. 51, Ex. A, at 1; Dkt. No. 77 at 2.)

(1)  The Parties' Positions

Plaintiff argues that "[t]here is no indication in the patent claims that the term 'financial institution' is intended to be limited to a statutory definition provided by the Bank Secrecy Act." (Dkt. No. 55, at 6.)  Plaintiff notes that "in the patent specification the inventors use the terms 'financial institution' and 'financial entity' interchangeably."  (*Id.*, at 6.)  Plaintiff also submits that because Claim 2 refers to a "financial institution" in a foreign country, "[p]lainly, the language of Claim 2 is broad enough to cover an institution that is not a financial institution, as defined by the Bank Secrecy Act."  (*Id.*, at 7.)  Further, Plaintiff argues, the Bank Secrecy Act ("BSA") definition is also overbroad because it includes, for example, "a dealer in precious metals, stones, or jewels; a pawnbroker; a travel agency; a business engaged in vehicle sales; a casino.  (*Id.* (citing Ex. B, 31 U.S.C. § 5312(a)).)  Plaintiff concludes that the Bank Secrecy Act

---

[2] Plaintiff previously proposed: "entity that offers financial services comprising one or more of the following: deposit taking, checking accounts, loans, or investment services."  (Dkt. No. 51, Ex. A, at 1; Dkt. No. 55, at 5-6; Dkt. No. 72, at 8.)

definition of "financial institution" is both too narrow and too broad.  (*Id.*, at 8.)   Finally,

Plaintiff cites several dictionary definitions.  (*Id.*, at 8-9.)

Defendants respond that Plaintiff itself has agreed that the phrase "government

restrictions" in Claim 1 is a reference to the requirements of the Bank Secrecy Act.  (Dkt. No. 75,

at 4 (citing Dkt. No. 55, at 14).)   Defendants then argue that a person of ordinary skill in the art,

upon reviewing the Bank Secrecy Act, would recognize a distinction between "financial

institutions" and "nonfinancial trades or businesses," such as in the provisions setting forth

currency transaction reporting requirements for financial entities and for non-financial entities

involved in transactions over $10,000.  (*Id.*, at 5 (citing 31 U.S.C. §§ 5313, 5331).)   Defendants

further argue that "[b]y qualifying the term 'financial institution' with the term 'formal,' the

specification makes clear that the term 'financial institution,' without qualification, is broader

than the term 'formal financial institution.'"  (*Id.*, at 6 (discussing '274 Patent at 1:9-16); *see*

Dkt. No. 55, at 2 ("The key to the invention disclosed by the '274 Patent is that it may be

practiced by a 'non-financial institution,' i.e., *an entity other than a formal financial entity, such

as a bank*, that provides banking accounts to its customers.") (emphasis added).)

As to Plaintiff's previously proposed construction (footnoted above), Defendants

respond, first, that Plaintiff was attempting to turn a list of exemplary financial services into a list

of mandatory services that an entity must offer in order to be considered a "financial institution."

(*Id.*, at 8.)   Defendants also note Plaintiff's original proposal that "financial institution" meant

"an organization that offers financial services, **such as** deposit taking, checking accounts, loans,

or investment services."  (*Id.* (quoting Ex. 8, Ex. A, 3/11/2013 Plaintiff's Preliminary Claim

Constructions and Extrinsic Evidence, at 6) (emphasis Defendants').)   Second, Defendants argue

that the four financial services identified by Plaintiff's previously proposed construction do not

appear in the specification and are ambiguous.  (Dkt. No. 75, at 8.)  Third, Defendants urge that "if the Court were to resort to [Plaintiff's] dictionary definition and decide to include a list of <u>exemplary</u> financial services, . . . such a list should include at least 'offering savings accounts' and all additional exemplary financial services that are included in the dictionary definitions cited in [Plaintiff's] opening brief."  (*Id.*, at 9 (citing Dkt. No. 55, at 8-9).)

Plaintiff replies that "[t]he definitional distinction in the BSA between 'financial institution' and 'nonfinancial trades or businesses' does not parallel the distinction between 'financial institution' and 'non-financial institution' in the '274 patent."  (Dkt. No. 77, at 1.)  As to the $10,000 transaction threshold and the currency reporting requirements cited by Defendants, Plaintiff replies that the same reporting requirements apply to both financial and non-financial entities.  (*Id.*, at 1-2 (citing 31 U.S.C. §§ 5313, 5331).)  Plaintiff also argues that "[g]rammatically and contextually, 'formal financial institution' at [the '274 Patent at] 1:15 is synonymous with and not narrower than 'financial institution' at 1:12-13."  (Dkt. No. 77, at 2.)  Plaintiff further argues that Defendants' alternative proposals are vague and "distort the extrinsic evidence."  (*Id.*)  Finally, Plaintiff revises its proposed construction of the disputed term so as to mean "bank."  (*Id.*)

At the June 25, 2013 hearing, Plaintiff also highlighted prosecution history in which the patentee characterized the "Licensed Money Transmitters" disclosed in United States Patent Application Publication No. 2005/0177496 ("Blagg") as "non-financial institutions."   (Dkt. No. 75, Ex. 11, 8/31/2006 Amendment, at 3 (MIC-P000117).)  Plaintiff urged that the BSA definition of "financial institution" cannot be correct because it would encompass those Licensed

Money Transmitters.  *See* Blagg at ¶ 31;[3] *see, e.g.,* 31 U.SC. § 5312(a)(2)(R) ("a licensed sender of money or any other person who engages as a business in the transmission of funds").

Defendants responded by reiterating Plaintiff's reference in its opening claim construction brief to "a formal financial entity, such as a bank" (cited above) and by citing deposition testimony by named inventor Aaron Levinas that the term "financial institution" includes not only "a bank" but also, for example, "a brokerage house."  (*See* Defendants' hearing slide numbered 23 regarding "financial institution" (quoting 4/16/2013 Levinas dep., at 76:18-22).)

(2)  Analysis

Claims 1 and 6 recite, in relevant part (emphasis added):

> 1.  A method authorizing remittance of money by a *non-financial institution* comprising:
> . . .
>     limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the *non-financial institution* to comply with government restrictions . . . .
>
> * * *
>
> 6.  The method according to claim 1, including providing the recipient a card which provides access to the recipient's account at a *financial institution*.

The specification repeatedly refers to "financial institutions" and "financial entities":

> Debit cards are generally cards by which the customer can make purchases and the amount of the purchase is debited against either prestored value on the card and/or an account which is backed up by an account in a *financial institution* or merely by an account and *financial institution*.  For some customers, they do not have the capability or wherewithal to open a banking account with a *formal*

---

[3] "An example of a Licensed Money Transmitter is Western Union.  A Licensed Money Transmitter is legally authorized to transmit funds, either by wire, facsimile, electronic transfer, courier or otherwise, within the United States or to or from locations outside the United States.  A Licensed Money Transmitter may also be authorized to sell or issue checks, drafts, warrants, money orders, traveler's checks or other negotiable instruments.  In some instances, a Licensed Money Transmitter may even be authorized to sell and/or exchange currency.  Unlike traditional bank transactions, however, transactions handled by a Licensed Money Transmitter are not insured by the FDIC."

> *financial institution* and therefore prepaid debit cards are common.  These are
> used, for example, as phone cards or gifts cards.  The present method uses such a
> reloadable value debit card as a basis for its remittance system.

('274 Patent at 1:6-19 (emphasis added).)

> Central processing center 12 limits the amount of money that can be loaded or
> transferred on any given day and the number of cards that can be issued to a
> single customer.  This is an effort to keep the cash transactions below $10,000
> limits.  For example, central process center 12 may only allow daily withdrawal
> or daily transfer of $830, per card and individual.  There is also a daily loading
> limit of $999 per card.

> Money remittance system allows a customer having a C card 18 to remit money to
> a recipient 28.  The C card 18 initiates a call at step S14 to the central processing
> center 12 to make a transfer after providing the recipient's personal information at
> step S9 to the operation center 16.  This information has been verified as
> appropriate by checking with the government agency 24 via step S10.  The central
> processing center 12 then sends transfer request file to and receives bank transfer
> files from a *paying financial entity 22* at step S15.  Central processing center 12
> also verifies personal profile and available funds with the *issuing financial entity
> 20* at step S16.  When all the accounts have been set up in the issuing financial
> entity 20 and the paying financial entity 22, funds are transferred via step S17
> from the issuing financial entity 20 to the paying financial entity 22.  The
> customer 18 informs the recipient 28 in step S18 of the transfer of money and its
> availability.  Recipient 28 then can request access to the transferred money from
> the paying financial entity 22 in step S19.  Although the initial system was set up
> that [*sic*] the issuing financial entity 20 was in the United States and the paying
> financial entity 22 is in a foreign country, the same procedure can be if [*sic*] the
> issuing financial entity 20 and the paying financial entity 22 are in the same
> country.

(*Id.* at 2:52-3:17 (emphasis added).)

Figure 1 illustrates an "Issuing Financial Institution" and a "Paying Financial Entity" and

is reproduced here:



FIG. 1

On one hand, the above-quoted reference to "$10,000 limits" in the specification ('274 Patent at 2:55-56) aligns with a section of the Bank Secrecy Act titled "Reports relating to coins and currency received in nonfinancial trade or business," which establishes reporting requirements for non-financial entities that receive more than $10,000 in coins or currency. 31 U.S.C. § 5331.  On the other hand, similar reporting requirements apply to financial entities as well.  *See* 31 U.S.C. § 5313 ("Reports on domestic coins and currency transactions").

Moreover, nothing in the claims, specification, or prosecution history suggests that the patentee defined "financial institution" to have the detailed, wide-ranging definition set forth in the Bank Secrecy Act:

"financial institution" means--

13

(A) an insured bank (as defined in section 3(h) of the Federal Deposit Insurance Act (12 U.S.C. 1813(h)));

(B) a commercial bank or trust company;

(C) a private banker;

(D) an agency or branch of a foreign bank in the United States;

(E) any credit union;

(F) a thrift institution;

(G) a broker or dealer registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.);

(H) a broker or dealer in securities or commodities;

(I) an investment banker or investment company;

(J) a currency exchange;

(K) an issuer, redeemer, or cashier of travelers' checks, checks, money orders, or similar instruments;

(L) an operator of a credit card system;

(M) an insurance company;

(N) a dealer in precious metals, stones, or jewels;

(O) a pawnbroker;

(P) a loan or finance company;

(Q) a travel agency;

(R) a licensed sender of money or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system;

(S) a telegraph company;

(T) a business engaged in vehicle sales, including automobile, airplane, and boat sales;

(U) persons involved in real estate closings and settlements;

(V) the United States Postal Service;

(W) an agency of the United States Government or of a State or local government carrying out a duty or power of a business described in this paragraph;

(X) a casino, gambling casino, or gaming establishment with an annual gaming revenue of more than $1,000,000 which--

    (i) is licensed as a casino, gambling casino, or gaming establishment under the laws of any State or any political subdivision of any State; or

    (ii) is an Indian gaming operation conducted under or pursuant to the Indian Gaming Regulatory Act other than an operation which is limited to class I gaming (as defined in section 4(6) of such Act);

(Y) any business or agency which engages in any activity which the Secretary of the Treasury determines, by regulation, to be an activity which is similar to, related to, or a substitute for any activity in which any business described in this paragraph is authorized to engage; or

(Z) any other business designated by the Secretary whose cash
transactions have a high degree of usefulness in criminal, tax, or regulatory
matters.

31 U.S.C. § 5312(a)(2); *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.

1996) ("[A] patentee may choose to be his own lexicographer and use terms in a manner other

than their ordinary meaning, as long as the special definition of the term is *clearly stated* in the

patent specification or file history.") (emphasis added).

Nonetheless, the above-quoted definition set forth in the BSA is probative extrinsic

evidence because the '274 Patent refers to the BSA. *See* '274 Patent at 2:30-34 ("The operation

center 16 and issuing financial entity 20 are responsible for compliancy with the Bank Secrecy

Act and for keeping information and providing reports such as the Suspicious Activity Report

and the Currency Transaction Report.").   Plaintiff also submits the following extrinsic

definitions:

"financial institution": "organization, e.g., a bank or brokerage, that offers
financial services such as deposit taking, checking accounts, loans, or various
investment services" (Dkt. No. 55, Ex. C, *Encarta World English Dictionary*
(North American ed. 2009) (MIC004952).)

"financial institution": "Institution which collects funds from the public and
places them in financial assets, such as deposits, loans, and bonds, rather than
tangible assets." (*Id.*, *InvestorWords.com – Online Investing Glossary*
(MIC004953).)

"financial institution": "An establishment that focuses on dealing with financial
transactions, such as investments, loans and deposits.  Conventionally, financial
institutions are composed of organizations such as banks, trust companies,
insurance companies and investment dealers." (*Id.*, Investopedia.com
(MIC004954).)

"Institution": "an established organization or corporation (as a bank or university)
esp. of a public character" (*Id.*, *Merriam Webster's Collegiate Dictionary* 648-49
(11th ed. 2003) (MIC004941-42).)

"financial": "relating to finance or financiers" (*Id.*, at 469 (MIC004939).)

> "finance": "the system that includes the circulation of money, the granting of credit, the making of investments, and the provision of banking facilities" (*Id.*)

Although extrinsic dictionary definitions are of limited weight during claim construction, these definitions are nonetheless a useful backdrop for construing "financial institution" in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1322-23 ("[J]udges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'") (quoting *Vitronics*, 90 F.3d at 1585).

Finally, the patentee acknowledged during prosecution that a "bank" is a "financial institution" (Dkt. No. 75, Ex. 11, 8/31/2006 Amendment, at 3 (MIC-P000117)), and Plaintiff now proposes construing the disputed term to mean "bank" (Dkt. No. 77, at 2). The specific services previously proposed by Plaintiff ("deposit taking, checking accounts, loans, or investment services" (Dkt. No. 72, at 8)) are merely examples and need not be included in the Court's construction. Instead, characterizing the services generally and providing well-known examples of financial institutions will be more useful and understandable for a jury. The Court has therefore consolidated and synthesized the above-quoted intrinsic and extrinsic evidence to arrive at the following construction:

The Court hereby construes **"financial institution"** to mean **"an entity that provides traditional banking products or services, for example, commercial banks, savings banks, credit unions, and brokerage houses."**

**B. "loading cash value on the customer's card" (Claim 1)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plaintiff does not believe that this claim term needs to be construed by the Court, but should be given its plain and ordinary meaning.[4] | "storing monetary value on the customer's debit card itself"[5] |

(Dkt. No. 72, at 1; Dkt. No. 77 at 2.)

(1)  The Parties' Positions

Plaintiff argues that "[n]one of the words used in this claim limitation have any esoteric meaning that requires clarification for the jury."  (Dkt. No. 55, at 10-11.)  Plaintiff also argues that "[i]t is clear from the claim language and the specification that the cash value may be stored in an account linked to the card and that the loading of cash value on the card is simply a means to track the balance in the customer's account available to spend by using the card."  (*Id.*, at 10-11.)

Defendants respond that "[t]he specification draws a clear distinction between transactions involving value that is actually stored on a physical card (card-based technology) and value that is stored in an account (account-based technology)."  (Dkt. No. 75, at 10.)  In further support of this distinction, Defendants cite United States Patent No. 5,637,845 ("Kolls").  (*Id.*, at 12.)  Finally, Defendants note that Claim 3 of the '274 Patent "refers to 'card to account transfers,' which further supports the idea that value can be transferred from being stored on the card itself to an account."  (*Id.*, at 11.)

---

[4] Plaintiff previously proposed as an alternative: "storing monetary value on the customer's debit card."  (Dkt. No. 51, Ex. A, at 3; Dkt. No. 55, at 10; Dkt. No. 72, at 1.)

[5] Defendants originally proposed: "*electronically* storing monetary value on the customer's card itself."  (Dkt. No. 51, Ex. A, at 3 (emphasis added).)

Plaintiff replies that "substituting the word 'storing' for the word 'loading' does not add clarity to the claim language."  (Dkt. No. 77, at 2.)  Plaintiff reiterates that "[n]either the claim language nor the specification requires that the cash value be encoded on the card's magnetic strip in order for value to be loaded on the customer's card."  (*Id.*, at 3.)

(2)  Analysis

Claims 1 and 6 recite (emphasis added):

1.  A method authorizing remittance of money by a non-financial institution comprising:
　　providing a customer with a debit card;
　　*loading cash value on the customer's card and setting up a customer account*;
　　obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number;
　　limiting the amount of money that may be *loaded onto the customer's card* and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with government restrictions;
　　verifying the personal information and the ability to transfer money of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury;
　　establishing a recipient account related to the customer's account after verification;
　　authorizing transfer of requested amount of money from the customer's account to the recipient's account;
　　and providing the recipient access to the recipient's account.

* * *

6.  The method according to claim 1, including providing the recipient a card which provides access to the recipient's account at a financial institution.

On one hand, Plaintiff's proposed construction would seem to read the word "onto" out of the claim by encompassing situations where the cash value does not reside on the physical card itself but rather resides in an account.  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving effect to all terms in the

claim.").   Defendants also emphasize that in a 2003 publication by "FSV," an entity that Defendants submit provided payment processing services to Plaintiff, FSV distinguished between storing funds in an account and storing funds on a physical card:

> FSV payroll debit cards use host-based stored-value technology, which means that the value associated with the card is stored and authorized centrally on a host computer system *rather than on the physical card itself*.  The *card is linked to an account* that manages the card's credits and debits in real time and a cardholder can only spend money that is in his or her particular card account.

(Dkt. No. 75, Ex. 8, *FSV Stored-Value Accounts vs. Demand Deposit Accounts (DDAs)*, at 2 (MIC-N002197) (emphasis added).)  Finally, both "card" and "account" appear in Claim 1 and, in general, "we must presume that the use of . . . different terms in the claims connotes different meanings."  *CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000); *accord Primos, Inc. v. Hunter's Specialties, Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006) ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous.").

On the other hand, the specification discloses "loading" a card in contexts where the cash value resides in an account rather than on the physical card itself:

> Debit cards are generally cards by which the customer can make purchases and the amount of the purchase is debited against either prestored value on the card *and/or an account* which is backed up by an account in a financial institution or merely by an account and financial institution.

('274 Patent at 1:9-13 (emphasis added).)

> *The card 18 is then loaded with the amount of money that the customer has provided* to the agent at the POS 14.  This *loading* is performed by POS device 14.  This information is transmitted to the central processing center 12 at step S4. Upon receipt of the information, the central processing center 12 requests authorization from an issuing financial entity 20 at step S5 and receives approvals at step S6.  The central processing center 12 then approves or denies the *loading* at step S7.  If it is accepted, a receipt is printed at the POS 14, step S8.  *Loading*

19

> *the money* or making an initial telephone call *activates a customer account at the central processing center.* The C card 18 then may be used to make purchases at stores as a debit card, at ATM machines, and as a telephone calling card.

(*Id.* at 2:4-18 (emphasis added).)

> As previously described, a C card 18 is provided to a customer at step 30. Cash value is *loaded onto the card* at step 32 at POS 14. *The customer account is activated* at step 34 by the central process center 12.

(*Id.* at 3:20-24 (emphasis added).)

On balance, the recitals of "accounts" in Claim 1 demonstrate that the claim is directed to the account-based embodiments rather than to embodiments in which value is stored on a physical card itself. Defendants' proposed construction, "storing monetary value on the customer's debit card *itself*," is therefore hereby expressly rejected.

The Court accordingly hereby construes **"loading cash value on the customer's card"** to mean **"storing monetary value in an account associated with the customer's debit card."**

**C. "obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number" (Claim 1)**

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "obtaining from the customer (a) the customer's name[], address, and phone number and (b) the name, address, phone number and recognizable government identification number of a recipient"[6] | "obtaining from the customer (*i.e.*, the person transferring money) (a) the name, address, and phone number of the customer and (b) the name, address, phone number and recognizable government identification number of the recipient of the transfer"[7] |

---

[6] Plaintiff previously proposed (emphasis added): "obtaining from the customer (a) the customer's name, address, and phone number and (b) the name, address, phone number and recognizable government identification number of a *person to whom a customer may transfer money*." (Dkt. No. 51, Ex. A, at 5; Dkt. No. 55, at 11; Dkt. No. 72, at 9).

[7] Defendants originally proposed: "obtaining from the customer *and not from some other source* (a) the name, address, and phone number of the customer and (b) the name, address, phone number and recognizable government identification number of *an individual to whom the customer seeks to transfer money*." (Dkt. No. 51, Ex. A, at 4-5 (emphasis added).)

(Dkt. No. 72, at 9; Dkt. No. 77 at 6.)

(1)  The Parties' Positions

Plaintiff argues that "the customer can be a customer and a recipient at the same time."   (Dkt. No. 55, at 12.)   Plaintiff submits: "The purpose of Defendants' proposed construction is to exclude embodiments where customers wish to transfer money to other existing customers of the non-financial institution, by requiring them to provide again all of the personal data regarding the recipient that the non-financial institution has already obtained from the recipient as customer."  (*Id.*)

Defendants urge that "a proper construction of this step is crucial to prevent [Plaintiff] from egregiously misconstruing the claim by identifying different people as the claimed 'customers' and 'recipients' for purposes of different claim steps."   (Dkt. No. 75, at 13.) Defendants argue that "[b]ased on the fundamental antecedent basis requirement, claim 1 unambiguously refers to the same customer and the same recipient, respectively, throughout the claim."  (*Id.*, at 14.)  Defendants emphasize that adopting Plaintiff's proposal "would both violate the antecedent basis requirement and improperly render superfluous the requirement that the customer of the claim provide the personal information of the recipient of the claim." (*Id.*, at 15.)

Plaintiff replies, as to Defendants' proposed references to "a person transferring money" and "the transfer," that "[t]he obtaining step addresses obtaining information; it does not address transferring money."  (Dkt. No. 77, at 5.)  Finally, "[i]n order to simplify the claim language," Plaintiff has revised its proposed construction as set forth in the chart above.  (*Id.*, at 6.)

(2)  Analysis

Claim 1 recites (emphasis added):

1.  A method authorizing remittance of money by a non-financial institution comprising:

        providing a customer with a debit card;

        loading cash value on the customer's card and setting up a customer account;

        *obtaining from the customer a) customer's name, customer's address, customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number*;

        limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with government restrictions;

        verifying the personal information and the ability to transfer money of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury;

        establishing a recipient account related to the customer's account after verification;

        authorizing transfer of requested amount of money from the customer's account to the recipient's account;

        and providing the recipient access to the recipient's account.

On balance, the recited "obtaining" is "from the customer," and the constituent term "customer" should refer to the same person throughout the claim, absent some indication to the contrary.  *See, e.g., PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007) ("[T]he same terms appearing in different portions of the claims should be given the same meaning."); *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1356 (Fed. Cir. 2003) ("The words 'the use' require antecedent basis; thus, 'the use' refers to a specific 'use' rather than a previously undefined 'use.'"); *cf. Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) (noting "the identical language associated with the term 'discharge rate' in both clauses [b] and [d], namely 'from the common hopper to the material processing machine,'" and concluding that "the presence of that identical language clearly indicates that 'a discharge rate' in clause [b] is the same as 'the discharge rate' in clause [d].") (square brackets in original). Nothing in the claims or the specification warrants interpreting "customer" or "recipient" to have different meanings in different claim steps.

Thus, "customer" refers to the same customer throughout Claim 1, and "recipient" refers to the same recipient throughout Claim 1. Plaintiff's argument that the customer need not provide "personal data regarding the recipient that the non-financial institution has already obtained from the recipient as customer" (Dkt. No. 55, at 12) is therefore hereby expressly rejected.

In light of these findings, Defendants' proposal of the phrase "(*i.e.*, the person transferring money)" is unnecessary, would tend to confuse rather than clarify, and is potentially too narrow. Defendants' proposed parenthetical is therefore omitted from the Court's construction. Finally, Defendants' proposal of the phrase "of the transfer" is rejected as being redundant of the limitation in Claim 1 that recites "authorizing *transfer* of requested amount of money from the customer's account *to the recipient's account*."

The Court accordingly hereby construes **"obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number"** to mean **"obtaining from the customer both: (a) the name, address, and phone number of that customer; and (b) the name, address, phone number, and recognizable government identification number of a recipient."**

**D.  "limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with government restrictions" (Claim 1)**

| Pl.'s Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with the Bank Secrecy Act and related regulations"[8] | NetSpend proposes:<br>"to comply with Bank Secrecy Act requirements, a central processing center of the non-financial institution limits (a) the amount of money that may be loaded onto the customer's card and (b) the number of cards issued to the customer"[9]<br><br>PreCash proposes:<br>"in order to comply with government laws or regulations that prohibit non-financial institutions from (a) loading more than a set amount of money onto the customer's card and (b) issuing more than a set number of cards to the customer, the non-financial institution processes card transactions and card issuance in one location that prevents load transactions and issuance of cards that would violate those laws or regulations"<br><br>PreCash asserts in the alternative that this claim term is indefinite.[10] |

---

[8] Plaintiff originally proposed (emphasis added): "restricting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution *in order to conform, submit, or adapt to record keeping and reporting requirements relating to currency transactions* provided by the Bank Secrecy Act and related regulations."  (Dkt. No. 51, Ex. A, at 6; Dkt. No. 55, at 13; Dkt. No. 72, at 7.)

[9] NetSpend originally proposed: "to comply with Bank Secrecy Act requirements that are applicable to non-financial institutions, a central processing center of the non-financial institution limits (a) the amount of money that may be loaded onto the customer's card and (b) the number of cards issued to the customer."  (Dkt. No. 51, Ex. A, at 6.)

[10] PreCash originally proposed: "PreCash asserts that this claim term is indefinite.  If the Court determines that this claim term is amenable to construction, PreCash proposes, in the alternative, the following construction: 'the non-financial institution processes card transactions and card issuance in one location that prevents (a) load transactions that would violate state or federal laws or regulations applicable to non-financial institutions that prohibit loading more than a set amount of money onto the customer's card and (b) issuance of a card that would violate state or federal laws or regulations applicable to non-financial institutions that prohibit issuing more than a set number of cards to a customer, in order to comply with those laws or regulations.'"  (Dkt. No. 51, Ex. A, at 6.)

(Dkt. No. 75, at 26; Dkt. No. 77, at 10.)

(1)  The Parties' Positions

Plaintiff argues that "Defendants seek to import into the limiting claim language a limitation that the regulations must be applicable to 'non-financial institutions' with a view to invalidating the claim or creating a non-infringement position based on an argument that the Bank Secrecy Act does not impose restrictions on 'non-financial institutions.'"  (Dkt. No. 55, at 15.)   Plaintiff counters that "[t]he patented invention contemplates that the non-financial institution will collaborate with financial entities or institutions, such as the issuing financial institution."  (*Id.*)  Plaintiff reasons that

> if one or more of the financial entities or institutions with whom the non-financial entity collaborates requires, as a condition of collaboration, that the non-financial institution limit the amount of money that may be loaded on a card and limit the number of cards issued in order to ensure that the financial institution complies with any restrictions imposed on it by the Bank Secrecy Act, then by complying with that requirement the non-financial institution can be said to have imposed those limits in order to comply with the government restrictions even if those restrictions are not directly binding on the non-financial institution as a matter of law.

(*Id.*)   Finally, Plaintiff argues that PreCash's proposed "set number of cards" limitation "is nothing more than a blatant attempt to fashion a non-infringement position" because "the government restrictions do not prohibit issuing more than a set number of cards."  (*Id.*, at 16.)

PreCash responds that the specification "indicates that the non-financial institution must perform the 'limiting' step of claim 1 to comply with government restrictions that specify card loading limits and card issuance limits."  (Dkt. No. 75, at 29 (citing '274 Patent at 1:35).)  PreCash submits that "[t]he PTO believed during prosecution that this limitation requires compliance with government restrictions imposing express card limits and load limits, and the Court should reject [Plaintiff's] attempt to eliminate this requirement by distorting the plain

25

meaning of the claim." (*Id.*, at 30.)  Finally, PreCash urges, if the disputed term is not limited as

PreCash proposes, then the claim is insolubly ambiguous and therefore indefinite.  (*Id.* (citing

*United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) ("The statutory requirement

of particularity and distinctness in claims is met only when they clearly distinguish what is

claimed from what went before in the art and clearly circumscribe what is foreclosed from future

enterprise.")).)

Plaintiff replies that PreCash's proposal "seek[s] to import non-existent limitations,

requiring that the limiting be done in order to comply with non-existent provisions of the BSA

that expressly 'prohibit' non-financial institutions from loading more than a specified amount of

money on a customer's card and issuing more than a specific number of cards etc. and which

would be violated if those limits were exceeded."  (Dkt. No. 77, at 10.)

(2)  Analysis

Claim 1 recites, in relevant part (emphasis added):

1.  A method authorizing remittance of money by a non-financial institution
comprising:
     providing a customer with a debit card;
     loading cash value on the customer's card and setting up a customer
account;
     obtaining from the customer a) customer's name, customer's address, and
customer's phone number and b) a recipient's name, recipient's address,
recipient's phone number, and recipient's recognizable government identification
number;
     *limiting the amount of money that may be loaded onto the customer's card
and the number of cards issued to the customer by a central processing center of
the non-financial institution to comply with government restrictions; . . . .*

The Background and Summary of the Invention refers to "appropriate regulations":

To comply with the appropriate regulations, the amount of money that may be
loaded onto a customer card or the number of cards issued to the customer is
limited.

('274 Patent at 1:35-37.)  The specification then discloses compliance with the Bank Secrecy

Act, such as by providing reports:

> An agent at the POS 14 sells a C card 18 to a customer.  The customer then gives
> the agent at POS 14 cash at step S3.  The card includes a PIN and a password
> under a security label.  Before the money can be loaded onto the card 18, the
> cardholder must enter a PIN verification.  The card 18 is then loaded with the
> amount of money that the customer has provided to the agent at the POS 14.  This
> loading is performed by POS device 14.  This information is transmitted to the
> central processing center 12 at step S4.  Upon receipt of the information, the
> central processing center 12 requests authorization from an issuing financial entity
> 20 at step S5 and receives approvals at step S6.
>
> * * *
>
> The operation center 16 and the financial entity 20 are responsible for
> coordinating with governmental agencies 24, respectively, and its responsibility
> for compliance with various federal and state laws.  The operation center 16 and
> issuing financial entity 20 are responsible for *compliancy with the Bank Secrecy
> Act* and for *keeping information and providing reports such as the Suspicious
> Activity Report and the Currency Transaction Report*.  Operation center 16 also
> will obtain all the authorizations, registrations and licenses on the federal and
> state levels dealing with money transfer services.  Under the Patriot Act, the
> operation center 16 will also provide a written anti-money laundering program.
> One of the government agencies 24 is the Office of Foreign Assets Control
> ("OFAC") of U.S. Department of Treasury.  The operation center 16 coordinates
> and verifies information with the OFAC.  It also verifies the identity of the
> customer and recipient against the list of specially designated nationals against
> whom restrictions apply.

 (*Id.* at 1:67-2:11 & 2:27-44 (emphasis added).)

On  balance,  Defendants  have  failed  to  demonstrate  that  the  recited  "government

restrictions"  must  necessarily  be  laws  or  regulations  that  govern  non-financial  institutions.

Instead, as Plaintiff has argued, the specification explains that a non-financial institution may

comply with government restrictions that are applicable to financial institutions with which the

non-financial  institution  may  interact.   (*See*  '274  Patent  at  1:35-37,  1:67-2:11  &  2:27-44.)

Likewise, PreCash's proposal that "the non-financial institution processes card transactions and

card issuance *in one location*" is hereby expressly rejected as unsupported.

27

Still, the claims explicitly recite limits on the number of cards and the amount of money per card.  Because the patentee added the disputed term to Claim 1 during prosecution in order to overcome prior art rejections, the patentees statements regarding this limitation are particularly probative.  *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) ("The patentee is bound by representations made and actions that were taken in order to obtain the patent.").  To whatever extent the claim language is deemed unclear, the following prosecution history clarifies the claim scope.

During prosecution, the examiner rejected the pending claims, citing prior art that disclosed compliance with government regulations.  (Dkt. No. 55, Ex. F, 11/20/2006 Office Action, at 5-8 (MIC-N000100-103).)  The patentee and the examiner then held a telephonic interview on January 16, 2007, and an Interview Summary reflects that "Examiners agree that amended claims by Applicants overcome the cited references . . . ."  (*Id.*, 1/16/2007 Interview Summary (MIC-N000087).)  The patentee amended Claim 1 so as to introduce the disputed term as a new limitation (with the exception of the phrase "by a central processing center of the non-financial institution").  (*Id.*, 1/16/2007 Amendment After Final, at 4 (MIC-N000091).)  Yet in the subsequent Office Action, the examiner rejected the claims again and stated:

> First, it is believed that the government, under the Patriot Act and enforced by the Office of Foreign Asset Control, only limits the amounts of money to be transferred but does not impose a restriction as to how much a card can be loaded nor does it limit the number of cards [that can] be issued to the customers.

(*Id.*, 2/16/2007 Office Action, at 7 (MIC-N000079).)

The patentee and the examiner then held a personal interview on June 6, 2007, and an Interview Summary reflects: "Applicant agrees to amend the claim to include the limiting step is done by the non-financial institution and to further provide arguments as to how the proposed language would overcome the cited references."  (*Id.*, 6/6/2007 Interview Summary (MIC-

28

N000070).)  The patentee amended Claim 1 so as to add "by a central processing center" to the

disputed term, and the patentee stated that the "Michelson" reference cited by the examiner

> does not teach limiting the amount of money that may be loaded on a customer's
> card and the number of cards issued to a customer to comply with the government
> restrictions.  Although it may describe limiting the amount of money to be
> transferred at one time and the sum of the transfers, it does not describe limiting
> the value on card and the number of cards that may be issued.

(*Id.*, 6/7/2007 Amendment, at 2 (MIC-N000059).)   The patentee and the examiner then

conducted a telephonic interview on June 19, 2007, during which the patentee authorized the

examiner to add the phrase "of the non-financial institution."   (*Id.*, 6/28/2007 Notice of

Allowability, at 2-3 (MIC-N000048-49).)  The Notice of Allowance then issued together with

the Examiner's Amendment, explaining that "[p]er the personal interview and the arguments

made by applicant on 06/07/2007, the examiners agree with applicants that [the references at

issue] do not teach the limiting, by the non-financial institution, of the number of cards in order

to meet or comply with government restrictions."  (*Id.*, at 4 (MIC-N000050).)

    Thus, in order to obtain allowance, the patentee explicitly relied on limiting the amount

of money that may be loaded on a customer's card and the number of cards issued to a customer.

That reliance should be given effect during claim construction.  *Typhoon Touch*, 659 F.3d

at 1381.   Nonetheless, the claim merely recites that such limitations are imposed so as "to

comply."  Nothing in the patent or the above-discussed prosecution history warrants finding that

the recited "government restrictions" directly limit the amount of money that can be loaded onto

a card or the number of cards that may be issued to a customer.  Instead, the limits could merely

facilitate compliance by, for example, limiting daily transaction amounts so as to mitigate or

prevent the need for Currency Transaction Reports.  (*See* '274 Patent at 2:30-34 & 2:52-56;

31 U.S.C. § 5331 ("Reports relating to coins and currency received in nonfinancial trade or

business," which establishes reporting requirements for non-financial entities that receive more than $10,000 in coins or currency in one transaction or a series of related transactions).)

In sum, PreCash has failed to justify its proposal of "government laws or regulations that prohibit non-financial institutions from (a) loading more than a set amount of money onto the customer's card and (b) issuing more than a set number of cards to the customer" or, in other words, that the laws or regulations must themselves specify limits on the amount of money per card and the number of cards.  PreCash's proposal in this regard is hereby expressly rejected.

The Court therefore hereby construes **"limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with government restrictions"** to mean **"a central processing center of the non-financial institution prevents (a) loading more than a set amount of money onto the customer's card, and (b) issuing more than a set number of cards to the customer, in order to comply with Bank Secrecy Act requirements."**

Because this term is amenable to construction, as set forth above, and also for the same reasons discussed as to the "monitoring and limiting . . ." term, below, PreCash's indefiniteness argument is hereby expressly rejected.  *Exxon*, 265 F.3d at 1375.

**E.  "monitoring and limiting loading of cash, transferring of money and accessing by recipient to comply with government money laundering restrictions" (Claim 7)**

| Pl.'s Proposal | Defendants' Proposed Construction |
| --- | --- |
| "monitoring and limiting loading of cash, transferring of money and accessing by recipient to comply with Bank Secrecy Act requirements that relate to money laundering"[11] | NetSpend proposes: "monitoring and limiting loading of cash, transferring of money and accessing by recipient to comply with Bank Secrecy Act requirements that relate to money laundering"[12] <br><br> PreCash asserts that this claim term is indefinite.  If the Court determines that this claim term is amenable to construction, PreCash proposes, in the alternative, the following construction: "in order to comply with government money laundering laws or regulations that prohibit loading, transferring, and accessing more than a set amount of money, the non-financial institution (a) monitors loading of cash, transferring of money and accessing by recipient and (b) prevents such transactions that would violate those laws or regulations"[13] |

[11] Plaintiff originally proposed: "monitoring and limiting loading of cash, transferring of money and accessing by recipient in conformity with a money laundering program implemented pursuant to requirements of the Bank Secrecy Act, the Patriot Act and related regulations."  (Dkt. No. 55, at 23.)  In the parties June 7, 2013 Joint Claim Construction Chart, Plaintiff proposed: "monitoring and limiting loading of cash, transferring of money and accessing by recipient to conform, submit, or adapt to a money laundering program implemented pursuant to requirements of the Bank Secrecy Act, the Patriot Act and related regulations."  (Dkt. No. 72, at 15.)

[12] NetSpend originally proposed: "to comply with Bank Secrecy Act requirements that relate to money laundering and are applicable to non-financial institutions, monitoring and limiting (a) the customer's loading of cash, (b) transferring of money from the customer to the recipient, and (c) the recipient's accessing such transferred funds."  (Dkt. No. 51, Ex. A, at 14-15.)

[13] PreCash originally proposed: "the non-financial institution (a) monitors the loading of cash, the transferring of money and the accessing by recipient to identify any such loading of cash, transferring of money, or accessing by recipient that would violate state or federal money laundering laws or regulations applicable to non-financial institutions that prohibit loading, transferring, and accessing more than a set amount of money and (b) limits the loading of cash, the transferring of money and the accessing by recipient that would violate state or federal money laundering laws or regulations applicable to non-financial institutions that prohibit loading, transferring, and accessing more than a set amount of money, in order to comply with those laws or regulations."  (Dkt. No. 51, Ex. A, at 14-15.)  In the parties' June 7, 2013 Joint Claim Construction Chart, PreCash proposed: "in order to comply with government money laundering laws or regulations that prohibit non-financial institutions from loading, transferring or accessing more than a set amount of money, the non-financial institution (a) monitors the loading of cash, transferring of money and accessing by recipient to identify any such loading of cash, transferring of money, or accessing by recipient and (b) prevents such transactions that would violate those laws or regulations."  (Dkt. No. 72, at 15.)

(Dkt. No. 72, at 15; Dkt. No. 77, at 10.)

<u>(1)  The Parties' Positions</u>

Plaintiff incorporates-by-reference its arguments regarding the term "limiting the amount of money that may be loaded . . . and the number of cards issued . . .," discussed above.  (Dkt. No. 55, at 25.)  In particular, Plaintiff urges that "the non-financial institution of the patent may nevertheless be required by the financial entities with which it collaborates or otherwise be motivated to implement a money-laundering program in accordance with the requirements of the Bank Secrecy Act."  (*Id.*)

Defendants' response and Plaintiff's reply address this term together with the term "limiting the amount of money that may be loaded . . . and the number of cards issued . . .," discussed above.  (*See* Dkt. No. 75 at 26-30; Dkt. No. 77, at 9-10.)

<u>(2)  Analysis</u>

Claim 7 recites:

> 7.  The method according to claim 1, including monitoring and limiting loading of cash, transferring of money and accessing by recipient to comply with government money laundering restrictions.

As found regarding the term "limiting the amount of money that may be loaded . . . and the number of cards issued . . .," discussed above, the recited government restrictions need not be directly applicable to the non-financial institution.  Instead, as Plaintiff has argued, a non-financial institution may comply with government restrictions that are applicable to financial institutions with which the non-financial institution may interact.  (*See* '274 Patent at 2:27-44.)

As to PreCash's indefiniteness argument, the specification provides context for the "monitoring and limiting" recited in Claim 7 by disclosing limits on the amounts of transactions:

To comply with the appropriate regulations, the amount of money that may be loaded onto a customer card or the number of cards issued to a customer is limited.  Also there is recording and tracking of all card transfers.

* * *

Under the Patriot Act, the operation center 16 will also provide a written anti-money laundering program.

* * *

Central processing center 12 limits the amount of money that can be loaded or transferred on any given day and the number of cards that can be issued to a single customer.  This is an effort to keep the cash transactions below $10,000 limits.  For example, central process center 12 may only allow daily withdrawal or daily transfer of $830, per card and individual.  There is also a daily loading limit of $999 per card.

('274 Patent at 1:35-38, 2:37-38 & 2:52-59.)  On balance, PreCash has failed to "show[] by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area."  *Halliburton*, 514 F.3d at 1249-50.  PreCash's indefiniteness argument is hereby expressly rejected.

Finally, the parties have agreed that the term "government restrictions" in Claim 1 is a reference to the requirements of the Bank Secrecy Act, so the term "money laundering restrictions" in Claim 7 refers to the requirements of the Bank Secrecy Act that relate to money laundering.  With this understanding, and having expressly rejected PreCash's arguments, the Court finds that no further construction is necessary.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.");  *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d

1351, 1362 (Fed. Cir. 2008) ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").

The Court therefore hereby construes **"monitoring and limiting loading of cash, transferring of money and accessing by recipient to comply with government money laundering restrictions"** to have its plain and ordinary meaning.

### F. "verifying the personal information and the ability to transfer money of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "verifying the obtained personal information of the customer and the recipient as appropriate with the Office of Foreign Assets Control of the United States Treasury ('OFAC') and verifying that OFAC does not restrict the ability of the customer to transfer money to the recipient"[14] | "confirming with the Office of Foreign Assets Control of the United States Treasury ('OFAC') (a) the validity of each item of customer and recipient personal information obtained in the 'obtaining' step and (b) that OFAC does not restrict the ability of the customer to transfer money to the recipient"[15] |

(Dkt. No. 75, at 17; Dkt. No. 77, at 6.)

---

[14] Plaintiff originally proposed: "checking one of [sic, or] more items of the obtained personal information of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury ('OFAC') and establishing whether information in OFAC's database restricts the ability of the customer to transfer money to the recipient." (Dkt. No. 51, Ex. A, at 9.) In the parties' June 7, 2013 Joint Claim Construction Chart, Plaintiff proposed: "verifying one of [sic, or] more items of the obtained personal information of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury ('OFAC') and establishing whether information in OFAC's database restricts the ability of the customer to transfer money to the recipient." (Dkt. No. 72, at 11.)

[15] PreCash previously proposed: "verifying with the Office of Foreign Assets Control of the United States Treasury ('OFAC') (a) the validity of each item of customer and recipient personal information obtained in the 'obtaining' step and (b) that neither the customer nor the recipient appears in OFAC's list of specially designated nationals." (See, e.g., Dkt. No. 72, at 11.) NetSpend previously proposed: "verifying with the Office of Foreign Assets Control of the United States Treasury ('OFAC') (a) the validity of each item of customer and recipient personal information obtained in the "obtaining" step and (b) that OFAC does not restrict the ability of the customer to transfer money to the recipient." (Id.)

"The parties agree that the 'verifying' step requires 'verifying the personal information' that the non-financial institution obtained from the customer in the 'obtaining' step."  (Dkt. No. 75, at 17.)

(1)  The Parties' Positions

Plaintiff argues that "[t]he claim language does not require that every single item of personal information obtained during the obtaining step be verified."  (Dkt. No. 55, at 17-18.) Plaintiff further submits that "Defendants also attempt to restrict the scope of the claim by specifying a precise manner in which the ability of the customer to transfer money to a recipient may be verified."  (*Id.*, at 18.)

Defendants respond that "[t]he antecedent basis requirement mandates that each item be verified."  (Dkt. No. 75, at 17.)  Defendants also submit that:

> The specification likewise confirms that claim 1 requires two distinct types of verification by explaining that "operation center 16 coordinates and <u>verifies</u> information with the OFAC.  It <u>also verifies</u> the identity of the customer and recipient against the list of specially designated nationals against whom restrictions apply."  ['274 Patent] at 2:41-44 (emphasis added).

(Dkt. No. 75, at 19.)  Further, Defendants cite prosecution history in which the patentee stated: "Even if [Social Security numbers] were verified, there is no indication that the verification . . . would include verification of the ability to transfer money.  At most it would be just a verification of the personal information identity."  (*Id.* (quoting Ex. 11, 8/31/2006 Amendment, at 1-2  (MIC-N000116-17)).)   Finally, Defendants submit that "[Plaintiff's] own dictionary definition confirms that 'verifying' and 'confirming' are synonyms and that 'verify' means 'to establish the truth, accuracy, or reality of.'"  (Dkt. No. 75, at 20 (citing Dkt. No. 55, Ex. C, *Merriam Webster's Collegiate Dictionary* 1389 (11th ed. 2003) (MIC004951)).)

35

Plaintiff replies that "[t]he objective of the first part of the verifying step is to verify whether a person appearing in the OFAC database is either the customer or the recipient.  This is done by using as much of the obtained personal information as appropriate to determine whether a match exists, which need not be all of it."  (Dkt. No. 77, at 6-7.)  Plaintiff counters Defendants' antecedent basis argument by emphasizing that the constituent term "the personal information" "is not identical to the description of the information obtained in the obtaining step."  (*Id.*, at 7.)  Plaintiff also argues that its proposed construction acknowledges that the verifying step is "a two-stage process" because "[i]n order to verify whether the customer or the recipient appears on [OFAC's specially designated nationals] list, . . . the non-financial institution must verify the personal information of the customer and the recipient as appropriate with OFAC to determine whether a person appearing on such is the same person as the customer or the recipient."  (*Id.*, at 8.)

(2)  Analysis

As a threshold matter, the Court adopts the parties' agreement, at least as of the time of the June 7, 2013 Joint Claim Construction Chart (Dkt. No. 72, at 11), that the constituent term "verifying" is readily understandable and need not be construed.  *See U.S. Surgical*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy."); *see also O2 Micro*, 521 F.3d at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims.").  At the June 25, 2013 hearing, Defendants indicated they would not object if the Court left the constituent term "verifying" unconstrued.

Claim 1 recites, in relevant part:

> 1.  A method authorizing remittance of money by a non-financial institution comprising:
>> . . .
>> obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number;
>> . . .
>> verifying the personal information and the ability to transfer money of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury; . . . .

The specification discloses verification of information and of identity:

> The operation center 16 coordinates and *verifies information* with the OFAC.  It *also verifies the identity* of the customer and recipient against the list of specially designated nationals against whom restrictions apply.

('274 Patent at 2:41-44 (emphasis added).)

First, the parties dispute whether all of the obtained personal information must be verified.   Second, although the parties agree that the disputed term involves two stages of "verifying," the parties dispute whether those stages constitute distinct, separate steps.

As to the first issue, the term "the personal information" has no explicit antecedent basis in Claim 1 of the '274 Patent (quoted above).   Plaintiff submits extrinsic evidence from the United States Department of the Treasury explaining that the determination of whether a person appears on OFAC's list of specially designated nationals could be accomplished with only a small subset of the personal information recited in the "obtaining" step in Claim 1.  (Dkt. No. 55, Ex. E, *U.S. Department of the Treasury, Resource Center: Frequently Asked Questions and Answers*, at pp. 1-2 of 51 (Page ID # 1092-93).)  For example, if a customer's name does not appear on OFAC's list, then no further customer information is needed.  (*See id.*)  If a customer's name appears on the list, then additional customer information, such as address and phone

number, could be checked against OFAC's list to ascertain whether the customer is, indeed, the same person whose name appears on the list.  (*See id.*)

Use of the definite article "the," however, generally refers to something recited previously in the claim.  *Warner-Lambert*, 316 F.3d at 1356 ("The words 'the use' require antecedent basis; thus, 'the use' refers to a specific 'use' rather than a previously undefined 'use.' . . . It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.  It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'") (citations omitted).  Further, the antecedent basis can be implicit rather than explicit.  *Energizer Holdings Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1371 (Fed. Cir. 2006) (holding that "an anode gel comprised of zinc as the active anode component" provided implicit antecedent basis for "said zinc anode"); *cf. Ex Parte Porter*, 25 U.S.P.Q. 2d (BNA) 1144, 1145 (B.P.A.I. 1992) ("The term 'the controlled fluid' . . . finds reasonable antecedent basis in the previously recited 'controlled stream of fluid . . . .'").

On balance, a person of ordinary skill in the art would find the general principles of antecedent basis applicable and would conclude that "the personal information" refers to all of the information obtained in the "obtaining" step.  But to reasonably ground the claim scope in the intrinsic disclosures regarding OFAC and the above-discussed extrinsic evidence regarding OFAC verifications, the Court's construction should reflect that the obtained personal information is verified only to the extent that OFAC has information corresponding to each piece of obtained personal information.

Turning to the second issue, the prosecution history elaborates on the two-stage nature of the claimed "verifying."  During prosecution, the patentee amended Claim 1 so as to recite (amendment underlined): "verifying the personal information <u>and the ability to transfer money</u> of

38

the customer and the recipient with the government."   (Dkt. No. 55, Ex. F, 8/31/2006

Amendment, at 3 (MIC-N000118).)   The patentee distinguished the "Fleming" reference, United

States Patent No. 5,953,710, arguing that

> there is no discussion in Fleming that the Social Security numbers are verified.
> Even if they were verified, there is no indication that the verification of the
> customer and the recipient with the Government agency would include
> verification of the ability to transfer money.  At most it would be just a
> verification of the personal information identity.

(*Id.*, at 2 (MIC-N000117).)   The examiner then agreed that "Fleming does not disclose or fairly

suggest the step of verifying the ability to transfer money."  (*Id.*, 11/20/2006 Office Action, at 3

(MIC-N000098).)   The patentee's explicit reliance upon two distinct verifications—of the

personal information and of the ability to transfer money—should be given effect during claim

construction.  *Typhoon Touch*, 659 F.3d at 1381.

The Court therefore hereby construes **"verifying the personal information and the
ability to transfer money of the customer and the recipient with the Office of Foreign
Assets Control of the United States Treasury"** to mean **"verifying the obtained personal
information of the customer and the recipient with the Office of Foreign Assets Control of
the United States Treasury ('OFAC') to the fullest extent that OFAC has corresponding
information, and verifying that OFAC does not restrict the ability of the customer to
transfer money to the recipient."**

### G. "establishing a recipient account related to the customer's account after verification" (Claim 1)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "after performing the verifying step, linking or aligning an existing recipient account or a newly established recipient account with a customer account" | "after performing the 'verifying' step, establishing an account for the recipient into which money may be transferred from the customer's account"[16] |

(Dkt. No. 51, Ex. A, at 10; Dkt. No. 75, at 20.)

#### (1)  The Parties' Positions

Plaintiff argues that the recipient account may exist before the establishing step occurs and need not be separate from the customer's account.  (Dkt. No. 55, at 19-20.)  As to the first issue, Plaintiff argues that "establishing" refers to establishing the relationship between the recipient account and the customer account, not to creating the recipient account.  (*Id.*, at 19.)  As to the second issue, Plaintiff argues that Defendants "are attempting to exclude from the scope of Claim 1 a situation where a customer establishes a secondary cardholder who may draw on the customer's account using a secondary card."   (*Id.*, at 20.)   Plaintiff counters that if "the transactions of the primary cardholder and the secondary cardholder are or can be separately accounted for, then a recipient 'account' has been established related to the customer's account." (*Id.*)

Defendants respond that Plaintiff "seeks to rewrite this disputed phrase by replacing the verb (establishing) with the adjective (related) to eliminate claim 1's requirement that the recipient account be established 'after verification' of information obtained from the customer."

---

[16] Defendants originally proposed: "after performing the 'verifying' step, establishing a recipient account that is linked to, but *separate* from, the customer's account."  (Dkt. No. 51, Ex. A, at 10 (emphasis added).)  In the parties' June 7, 2013 Joint Claim Construction Chart, Defendants proposed: "after performing the 'verifying' step, establishing a recipient account that is linked to, but *different* from, the customer's account."  (Dkt. No. 72, at 13 (emphasis added).)

(Dkt. No. 75, at 21.)  Defendants explain that the recital that the recipient account is "related" to the customer's account describes a characteristic the account must have *after* being established. (*Id.*)  Finally, Defendants argue that Plaintiff's discussion of primary and secondary cardholders within a shared account "ignores the claim's undeniable requirement that the customer's account must be an account from which money is transferred, and the recipient's account must be an account into which money is transferred."  (*Id.* at 22-23.)

Plaintiff replies that "[t]he establishing step requires a single step of 'establishing a recipient account related to the customer's account,' not two steps of (1) 'establishing a recipient's account' and (2) then linking that account to the customer's account."  (Dkt. No. 77, at 8.)  Plaintiff explains:

> The object of the establishing step is to link a recipient account to a customer account in order to authorize transfers from one account to the other.  This linking can be done in two different ways: (1) an existing recipient account is aligned with an existing customer account; or (2) a recipient account is set up, the recipient account set up by the paying entity is communicated to the issuing entity, and then the central processing center links the recipient's account to the customer account.

(*Id.*, at 8-9.)

<u>(2)  Analysis</u>

Claim 1 recites, in relevant part (emphasis added):

> 1.  A method authorizing remittance of money by a non-financial institution comprising:
> > providing a customer with a debit card;
> > loading cash value on the customer's card and setting up a customer account;
> > obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number;
> > . . .
> > *establishing a recipient account related to the customer's account after verification*;

41

> authorizing transfer of requested amount of money from the customer's
> account to the recipient's account;
>            and providing the recipient access to the recipient's account.

In general, the use of different terms in the same claim (here, "establishing" and "setting up") indicates a difference in meaning. *CAE Screenplates*, 224 F.3d at 1317 ("[W]e must presume that the use of . . . different terms in the claims connotes different meanings."); *accord Primos*, 451 F.3d at 848 ("[T]he terms 'engaging' and 'sealing' are both expressly recited in the claim and therefore 'engaging' cannot mean the same thing as 'sealing'; if it did, one of the terms would be superfluous.").

Here, the specification confirms that "establishing," as used in Claim 1, encompasses both "align[ing]" with an existing account and "set[ting] up" a new account:

> A recipient account is aligned with an existing account or is *set up* at step 40 by paying financial entity 22. The recipient account *set up* by the paying financial entity 22 is communicated to issuing financial entity 20. The central processing center 12 then links the recipient's account to the customer account.

('274 Patent at 3:31-36 (emphasis added).) "Aligning" a recipient account refers to using an existing recipient account. "Setting up" a recipient account refers to creating a new account. In either case, the pre-existing or newly-created recipient account is then linked to the customer account. *Id.*

Although Figure 2 discloses "set up customer account" and "set up recipient account," the claims should not be limited to the specific embodiments shown in the figures. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (noting that "patent coverage is not necessarily limited to inventions that look like the ones in the figures").

Both sides propose including the constituent term "establishing" or "established" in the construction, but because the parties dispute the meaning of "establishing", the construction should clarify that "newly established" in Plaintiff's proposal means "newly created."

Finally, as discussed further as to the "authorizing . . ." term, below, the Court hereby expressly rejects Plaintiff's argument that the customer account and the recipient account can be the same account.  *See CAE Screenplates*, 224 F.3d at 1317; *see also Primos*, 451 F.3d at 848.

The Court therefore hereby construes **"establishing a recipient account related to the customer's account after verification"** to mean **"after performing the verifying step, linking an existing recipient account, or a newly created recipient account, with a customer account."**

## H.  "authorizing transfer of requested amount of money from the customer's account to the recipient's account" (Claim 1)

| Plaintiff's Proposed Construction | Defs.' Proposed Construction |
|---|---|
| Plaintiff does not believe that this claim term needs to be construed by the Court, but should be given its plain and ordinary meaning.<br><br>If the Court determines that the term requires construction, Plaintiff proposes, in the alternative, the following construction:<br><br>"permitting transmission of requested amount of money from the customer's account to the recipient's account" | "authorizing a debit to the customer's account and a credit to the recipient's account in an amount requested by the customer" |

(Dkt. No. 51, Ex. A, at 11.)

<u>(1)  The Parties' Positions</u>

Plaintiff argues that Defendants' proposal is intended to allow Defendants to argue "that when a secondary cardholder performs a transaction using the secondary card, a debit may be created on the customer's account, but that a corresponding credit is not created on the recipient's account."  (Dkt. No. 55, at 21.)  Plaintiff counters that "[t]he plain and ordinary meaning of the word 'transfer' does not warrant introduction of the debit and credit limitations proposed by Defendants."  (*Id.*)  Plaintiff explains that "[i]f records are maintained that track the

transaction activities of the primary cardholder and the secondary cardholder, then transfers from the customer's account to the recipient's account can be shown to have occurred, regardless of whether there is also created, in the sense proposed by Defendant, a debit to the customer's account and a credit to the recipient's account."  (*Id.*, at 22.)

Defendants respond that Plaintiff's secondary cardholder interpretation does not involve a transfer from the customer's account to the recipient's account because both cardholders have merely been given the ability to spend money from their single, mutual account.  (Dkt. No. 75, at 23-24.)   Defendants explain that "the only 'transfer' that is authorized in [Plaintiff's] 'spending transaction' scenario is a transfer of money from the cardholders' mutual account to a third party's account . . . ."  (*Id.*, at 24.)  Defendants also cite an extrinsic document published by the Department of the Treasury as evidence that a "transfer" requires a debit from one account and a credit to another account.  (*Id.*, at 25 (discussing Ex. 15, *Fundamentals of the Funds Transfer Process*, at 55 (NSMC020332)).)  Defendants conclude that "[t]he Court's construction . . . should clarify that claim 1 requires, as it explicitly states, authorizing a transfer <u>from</u> the customer's account (*i.e.*, the sending account having associated value that is reduced by virtue of the transfer) <u>to</u> the recipient's account (*i.e.*, the receiving account having associated value that is increased by virtue of the transfer)."  (Dkt. No. 75, at 24.)

Plaintiff replies that "[t]he claim language does not require that an authorized transfer be effected in any particular manner."  (Dkt. No. 77, at 9.)  Plaintiff reiterates that "the claim term should not be construed so that authorizing a transfer of funds from one account to another account requires authorizing a debit to the customer's account and a credit to the recipient's account.   There is no suggestion in the language of the claims or in the specification that 'authorizing a transfer' should be so limited."  (*Id.*)

44

(2)  Analysis

Plaintiff submits extrinsic dictionary definitions of "transfer" as a noun meaning "an act, process, or instance of transferring" and as a verb meaning "to cause to pass from one to another: TRANSMIT."  (Dkt. No. 55, Ex. C, *Merriam Webster's Collegiate Dictionary* 1328 (11th ed. 2003) (MIC004949).)  But to focus on the meaning of the constituent term "transfer," divorced from the remainder of the disputed term and from the specification, would impermissibility "focus[] the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent."  *Phillips*, 415 F.3d at 1321.

On balance, a "transfer" in the context of the '274 Patent requires two distinct accounts. Otherwise, the recited requirement of a transfer "from" one account "to" another account would be read out of the claim.  *See Bicon*, 441 F.3d at 950 ("[C]laims are interpreted with an eye toward giving effect to all terms in the claim.").  Requiring two separate accounts is also consistent with the intrinsic evidence, wherein Figure 1 discloses a "Wire Transfer $$" from an "Issuing Financial Institution" to a "Paying Financial Entity."  Plaintiff's argument that activity of a secondary cardholder on the same account can constitute a "transfer" is hereby expressly rejected.

Finally, Defendants' proposal of a "debit" from one account is consistent with the specification.  (*See, e.g.,* '274 Patent at 1:9-13 ("Debit cards are generally cards by which the customer can make purchases and the amount of the purchase is *debited against* either prestored value on the card and/or an account which is backed up by an account in a financial institution or merely by an account and financial institution.") (emphasis added).)  Defendants' proposal of a "credit" is not directly supported by any disclosure in the specification, but the extrinsic evidence submitted by Defendants persuasively confirms what is seemingly self-evident, that for every

"debit" there must be a corresponding "credit."  (*See* Dkt. No. 75, Ex. 16, *Fundamentals of the Funds Transfer Process*, at 55 (NSMC020332).)  The use of "from" and "to" in the disputed term demonstrates that the debit is from the customer's account and the credit is to the recipient's account.

The Court therefore hereby construes **"authorizing transfer of requested amount of money from the customer's account to the recipient's account"** to mean **"authorizing a debit from the customer's account and a credit to the recipient's account in an amount requested by the customer."**

### I.  "card to account transfers" (Claim 3)

| Plaintiff's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| "transfer of funds from a customer's card or account to a recipient's account"[17] | "debit to the monetary value stored on the customer's card itself and credit to the recipient's account"[18] |

(Dkt. No. 72, at 4; Dkt. No. 77, at 3.)  At the June 25, 2013 hearing, Plaintiff revised its proposed construction to: "No construction required."

(1)  The Parties' Positions

Plaintiff incorporates-by-reference its arguments regarding the terms "loading cash value on the customer's card" and "authorizing transfer of requested amount of money from the customer's account to the recipient's account," discussed above.  (Dkt. No. 55, at 23.)  Plaintiff also argues that "the term 'card to account transfer' is used to describe any transfer of funds from

---

[17] Plaintiff previously proposed (emphasis added): "*transmissions* of funds from a customer's card or account to a recipient's account."  (Dkt. No. 51, Ex. A, at 13; Dkt. No. 55, at 22; Dkt. No. 72, at 4.)

[18] Defendants originally proposed: "debit to the *electronically* stored monetary value on the customer's card itself and credit to the recipient's account."  (Dkt. No. 51, Ex. A, at 13 (emphasis added).)

a customer holding a card to a recipient and that it should not be limited to a transfer from a card *per se*, which would exclude from the scope of Claim 3 tracking of transfers from a customer's account to a recipient's account."  (*Id.*)

Defendants argue this term together with the term "loading cash value on the customer's card," discussed above.  (*See* Dkt. No. 75, at 9-13.)

Plaintiff replies that the specification "treats account-to-account transactions interchangeably with card-to-account transfers."  (Dkt. No. 77, at 4 (citing '274 Patent at 1:37-41 & 1:46-47).)  Plaintiff also argues claim differentiation with respect to Claim 6:

> Claim 1 requires providing a customer with a debit card.  Claim 1 also requires providing the recipient access to the recipient's account, but does not specifically state that such access means be [*sic*] a debit card.  Claim 6 requires providing the recipient a card which provides access to the recipient's account at a financial institution.  Thus, based on the principles of claim differentiation, Claim 1 does not require providing recipient with a card.  Claim 1 requires authorizing a transfer of requested amount of money from the customer's account to the recipient's account, but does not specifically require authorizing a transfer from the customer's card to the recipient's account.  *Id.* at 4:2-25.
>
> Thus, when Claim 3 discloses "recording and tracking all card to account transfers," it is fairly interpreted as referring generically to transfers from a customer (card) to a recipient (account).

(*Id.*, at 4.)  Plaintiff concludes that "[b]y proposing a construction that requires recording and tracking of a debit to the monetary value stored on the customer's card itself and credit to the recipient's account, Defendants are not seeking to clarify the claim language; rather, they are seeking to impose limitations that do not appear in the claim language and are not supported by the intrinsic evidence."  (*Id.*, at 5.)

(2)  Analysis

Claims 1, 3, and 6 recite (emphasis added):

1.  A method authorizing remittance of money by a non-financial institution comprising:

47

> *providing a customer with a debit card*;
> *loading cash value on the customer's card and setting up a customer account*;
> obtaining from the customer a) customer's name, customer's address, and customer's phone number and b) a recipient's name, recipient's address, recipient's phone number, and recipient's recognizable government identification number;
> limiting the amount of money that may be loaded onto the customer's card and the number of cards issued to the customer by a central processing center of the non-financial institution to comply with government restrictions;
> verifying the personal information and the ability to transfer money of the customer and the recipient with the Office of Foreign Assets Control of the United States Treasury;
> establishing a recipient account related to the customer's account after verification;
> *authorizing transfer* of requested amount of money from the customer's account to the recipient's account;
> and providing the recipient access to the recipient's account.

* * *

3.  The method according to claim 1, including recording and tracking all *card to account transfers*.

* * *

6.  The method according to claim 1, including providing the recipient a *card which provides access to the recipient's account* at a financial institution.

The doctrine of claim differentiation, applied to Claim 6, suggests that Claim 1 does not require providing a card to the recipient, but Claim 1 nonetheless requires "providing a customer with a debit card."  As to the significance of that card, however, the specification discloses "card" transfers in the context of transfers between accounts and explains that a card may be used to access money that resides in an account:

> Once the transaction has been verified as acceptable, a recipient's account is established related to the customer's account.  *The amount of money requested by customer is transferred from the customer's account to the recipient's account. The recipient may be provided with a card providing access to the recipient's account.*  The recipient may be in the same country or in a foreign country.

48

> To comply with the appropriate regulations, the amount of money that may be loaded onto a customer card or the number of cards issued to the customer is limited. Also *there is recording and tracking of all card transfers*. A central location verifies the financial transaction, establishes the recipient accounts, and transfers the amount of money from the customer's account to the recipient's account. The operation center provides for obtaining the customer information as well as obtains state and federal licenses to allow authorized agents to sell debit cards and load cash value on the customer card at point-of-sale devices under the licenses. *The operation center records and tracks all card-to-account transfers.*

('274 Patent at 1:27-47 (emphasis added).)

Based on this disclosure, as well as the Court's analysis of the term "loading cash value on the customer's card," above, Defendants' proposal to limit the disputed term by requiring "monetary value stored on the customer's card itself" is hereby expressly rejected.

The Court accordingly hereby construes **"card to account transfers"** to mean **"transfers of funds from a customer's account to a recipient's account."**

## V. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

No later than the July 31, 2013 deadline to complete mediation (*see* Dkt. No. 82, 6/21/2013 Order), the parties are hereby ORDERED, in good faith, to mediate this case with James Knowles, the Court designated mediation in this case. As a part of such mediation, each party shall appear by counsel and by at least one corporate officer possessing sufficient authority and control to unilaterally make binding decisions for the corporation adequate to address any good faith offer or counteroffer of settlement that might arise during such mediation. Failure to

do so shall be deemed by the Court as a failure to mediate in good faith and may subject that party to such sanctions as the Court deems appropriate.

**So ORDERED and SIGNED this 17th day of July, 2013.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE